IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 2, 2017

IN RE K.Y.H.

Appeal from the Juvenile Court for Davidson County
No. 2013-5640    Sheila D.J. Calloway, Judge

No. M2017-00748-COA-R3-PT

This is a termination of parental rights case.  The Department of Children's Services filed a petition to terminate the parental rights of C.K.H. (mother) with respect to her child, K.Y.H.  The trial court found that clear and convincing evidence supported termination of mother's rights based upon the persistence of conditions that led to the removal of the child.  The trial court also found clear and convincing evidence that terminating mother's rights was in the best interest of the child.  Mother appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and BRANDON O. GIBSON, JJ., joined.

Thomas H. Miller, Nashville, Tennessee, for the appellant, C.K.H.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I.

DCS took custody of the child shortly after her birth.  It received a referral from hospital staff that the child, who was a medically-fragile infant, was about to be released from Vanderbilt Children's Hospital and staff was concerned that mother would not be

1

able to care for the child. The child had been in the Neonatal Intensive Care Unit for almost two months because she was born prematurely and had severe reflux problems. As a result, Vanderbilt Hospital staff asked mother to "room-in" with the child to receive the necessary training to properly care for the child's medical needs. Hospital staff reported concerns regarding mother's "irrational thought processes and specifically her failure to follow through with necessary 'rooming in' periods with [the child] prior to her discharge to learn and to become proficient in her necessary medical care requirements." In addition to finding probable cause for emergency removal and the retention by DCS of legal custody, the trial court also ordered that a 90-day trial home visit begin upon mother meeting three requirements: (1) the maternal grandmother being released from the hospital and indicating a willingness to have mother and child in her home; (2) Nurses for Newborns, an organization that provides in-home health assessments of newborns and mothers, education, positive parenting, and referral resources, begin services simultaneously with the trial home visits; and (3) mother and maternal grandmother meeting with the foster parent regarding the child's medical needs and treatments. Mother was also ordered to cooperate with all services.

A few months later, a trial home visit began in the maternal grandparents' home where mother was staying at the time. DCS retained legal custody and in-home services were in place. A few months after that, however, the trial home visit was terminated at the recommendation of the Nurses for Newborns nurse assigned to the case. The nurse testified that she was concerned about the lack of bond between mother and the child, the child's hygiene and development, and mother's mental health and ability to care for the child. The nurse noted on one visit that mother exhibited "manic tendencies," a "flight of ideas," and "couldn't sit still." On another visit, the nurse stated that mother had been recently discharged from the hospital, was slow to respond, and was "not real clear of everything that had happened with her" due to her new medication. On another visit, the nurse stated that mother showed the nurse where mother had cut herself since the last visit and that the nurse had trouble following the mother's train of thought. During that visit, the nurse stated that mother and the maternal grandmother argued, that mother threw her phone, went outside to smoke, and left the child in the playpen. The nurse noted the strained and negative relationship between mother and grandmother. The nurse stated that mother and grandmother would argue and yell and that mother would throw things when she became agitated. The nurse was concerned for the child's safety, even with the grandparents' supervision.

The nurse from Nurses for Newborns also testified that mother did not apply lotion to the child's skin and did not bathe her often. The nurse observed dry spit-up in the child's hair and "a putrid smell like vomit" on the child's clothes. The nurse testified that throughout the trial home visit period, the child's skin "was always very dry and brittle." The nurse further testified that mother may not have provided the child with the

correct type of play, resulting in a developmental deficit. On one visit, the nurse testified that the child was "twisting her hand" and "her arm was stiff." In most visits, the nurse arrived to find the child laying by herself or sitting in her swing by herself.

The Court Appointed Special Advocates (CASA) volunteer assigned to the case testified that mother seemed overwhelmed due to the child's digestive issues. The CASA volunteer testified that there "wasn't a good place for [the child] in the home. They were sleeping in the living room. They weren't able to establish [the child's] own place in the home . . . ." The volunteer believed that mother was not prepared to care for a newborn, much less a newborn with health issues. She supported terminating the trial home visit.

During the juvenile court hearing where mother's trial home visit was terminated, Mother acknowledged that she had been hospitalized at Vanderbilt Psychiatric Hospital on multiple occasions. Mother testified that, three weeks prior to the hearing, she had been hospitalized for ten days after witnessing a physical altercation between her friends and others, stating that she "could not handle witnessing her friends being injured." On another occasion, mother deliberately burned herself with a cigarette because she was upset about the trial home visit being disrupted. Mother had a contentious relationship with grandmother, and chaotic circumstances continued in the home since the commencement of the trial home visit. Testimony at trial also revealed that grandmother, who the parties and the court expected to assist mother with the child, mixed her narcotic pain medication with alcohol and was hospitalized at the time of the hearing. Once the trial home visit was terminated, the child was placed in her current foster home, where she has remained continuously ever since.

Mother's first-born child, G.H., who turned fifteen when K.Y.H. was born, was also taken into DCS custody shortly after K.Y.H.'s trial home visit with mother was terminated. G.H. is on the autism spectrum and had an Individual Education Plan[1] in place before being removed from public school and being homeschooled by mother. G.H. was taken into DCS custody after he threatened mother with a sword. He was then placed in Parkridge Valley Hospital in Chattanooga, Tennessee, for psychological and behavioral issues for nine months. G.H.'s permanency plan required mother to attend family therapy sessions with G.H. at the facility. However, those therapy sessions were unsuccessful. In one session, mother became agitated and took a fetal position on the floor in the corner of the room. In another session, the therapist and clinical team had to manage mother rather than conducting the therapy session. In another session, mother had an altercation with G.H. and "ended up on the floor again, agitated, listening to loud music, [and] arguing with the clinical team." The hospital terminated the sessions because it believed mother's behavior was harming G.H. G.H. attempted to defend

---

[1] An Individual Education Plan is a document developed for a public school child in need of special education.

mother at trial, but admitted that he did not want to return to live with her. G.H. subsequently moved in with his maternal grandfather until he aged out of state custody at the age of eighteen.

The juvenile court later found K.Y.H. to be dependent and neglected. The court cited mother's long history with mental illness, her noncompliance with mental-health treatment and medication, her conflicts with grandmother and G.H. in the home, the unsuccessful trial home visit, and her subsequent hospitalization at Vanderbilt Psychiatric Hospital after grandmother and grandfather became concerned about her "erratic behavior and inability to care for [the child]." Mother filed more than one motion for unsupervised visits with the child, which were denied due to mother's disruptive behavior during hearings.

DCS then filed a petition to terminate mother's parental rights based on persistence of conditions. DCS also alleged mental incompetence but has since dropped that ground. DCS's petition stated that the grounds that led to removal were K.Y.H.'s medically fragile condition, mother's irrational thought processes, and mother's failure to comply with the necessary rooming-in periods with the child prior to her discharge so that mother could learn and become proficient in necessary medical care requirements. DCS alleges these conditions persist based on mother's "erratic behavior and what appears to be inconsistent compliance with taking her prescribed medication."

Mother acknowledged that she has a long history of mental health disorders, including bipolar disorder, anxiety, depression, and post-traumatic stress disorder. Mother testified that her treating professionals disagreed as to whether she suffered from bipolar disorder or not. Mother's PTSD stems from sexual abuse as a child and teenager. Mother currently receives medication and psychotherapy treatments, but admitted that she has difficulty managing the side effects of her medication and sometimes wishes to be off of medication because of the side effects. Mother testified that she is compliant and stable on her current prescribed psychotropic medication, although she acknowledged that she has had trouble managing her medication in the past.

Mother admitted to attempting suicide on more than fifty occasions. She later testified that this number was exaggerated to gain admission to the psychiatric ward when she was pregnant with K.Y.H. Grandmother had kicked her out of the house. However, she did admit that she had attempted suicide on at least one occasion while her older, autistic son, G.H., was in the home with her. She also admitted other acts of self-harm, including burning herself with a cigarette when the trial home visit was interrupted. Mother stated her last suicide attempt was five years ago. Mother also admitted to being hospitalized in psychiatric wards on multiple occasions, most recently a few years ago during K.Y.H.'s trial home visit. She testified that she receives a disability check, but is

unsure how much the check is and depends on grandfather for money for gasoline and groceries.

Mother also underwent a parenting capacity assessment for DCS conducted by a psychologist. The psychologist noted mother's estimated fifty inpatient stays since she was eleven years old. He also noted mother's "history of recurrent, severe depression with periods of suicidality and significant deteriorations in her functioning." The psychologist diagnosed her with "Other Specified Bipolar and Related Disorder[,] Personality Disorder, Unspecified[,] Posttraumatic Stress Disorder, resolved[,] Substance Use Disorder, in remission." When asked by the psychologist about her visits with G.H. being discontinued because of her disruptive behavior harming G.H., mother blamed the facility personnel for antagonizing her. She also saw Vanderbilt Hospital staff as being vindictive, rather than well-intentioned, for reporting their concerns about her ability to care for K.Y.H. The psychologist noted that "[e]ven when [mother's] issues are not requiring hospitalization there is evidence that they cause impairments to her judgment and parenting abilities." He also stated in the assessment that mother's "persistent, severe mental health problems . . . have had a significant impact on her ability to effectively parent on a consistent basis." He did note that mother's relationship with grandmother contributed to her stress and destabilization, and that mother may function better in grandmother's absence. The psychologist summarized his findings by stating that mother had an above-average intelligence and seemed to understand the child's needs, but also "has persistent, severe mental health problems that have had a significant impact on her ability to effectively parent on a consistent basis." The psychologist stated further that

> All of the available evidence is that [mother's] psychological wellbeing is improved to her baseline. That is, her depression and anxiety are well controlled on her current medication and she has not been confused or hypomanic recently. Also, while [mother] grieves [grandmother's] death, the relationship added significantly to the stress in her life and at points contributed to her destabilization. Thus, in some ways she is better positioned to maintain her current level of functioning than she has been. However, given the severity and persistence of her psychological problems it is likely she will have future periods of hospitalization. She also continues to have significant problems with interpersonal interactions that undermine her ability to parent or use supports such as therapy and case management. Given her history the prognosis for long term improvement to her parenting abilities is guarded to poor.

5

Consequently, the psychologist recommended that (1) the family continue regular visitation; (2) mother complete family therapy with G.H.; (3) the return of either child be done through a gradual, well-monitored process extending well into the children's placement with her; (4) mother develop a plan of care for any children in her custody in the event her symptoms worsen or she is hospitalized again; (5) mother complete an anger management class; (6) mother complete a behavioral therapy class to bolster her ability to tolerate stress without acting out; and (7) mother continue medication and psychotherapy treatments.

Mother's mental health has been more stable since grandmother passed away in late-2014. However, there have been a few concerning incidents since grandmother's passing that have brought mother's mental stability into question. For example, at a hearing in late-2015, during the Nurses for Newborns nurse's testimony, mother made an outburst of derogatory comments, calling the nurse a liar. The court officer called for backup when he noticed mother pull a pair of pliers out of her bag. Mother then had a "meltdown or panic attack" and "stormed out" of the courtroom. G.H., who was present at the hearing, became upset, walked out of the courtroom, and had cut all of his hair off by the end of the hearing. At a child and family team meeting in late-2015, mother became upset with the family service worker because he had failed to timely submit her approval for visitations for the month, resulting in mother's visitations being pushed back to the end of the month. Mother had "a little meltdown," "stormed out," and said derogatory things about the worker.

K.Y.H. has thrived in the foster home where she has resided for the past three years. The Nurses for Newborns nurse noted that the child's growth notably improved after she was returned to her foster home after the trial home visit. She also noted a close bond between the foster parents and the child for the time she observed them. The foster parents have provided grandfather with unsupervised visits on the weekend and mother with separate supervised therapeutic visits. The child was initially very slow developmentally. She was unable to sit on her own until she was approximately sixteen months old and did not begin walking until well after her second birthday. She still wears braces on her ankles to assist her with walking. Prior to her placement with the foster parents, the child had dropped to the second percentile for growth. However, shortly after arriving in the foster home, the child's growth had improved to the twenty-fifth percentile and continued to progress upward from there. The child's developmental screening also increased by sixty points within a short period of time. Her skin was very dry and scaly when she first arrived in the foster home, but has since softened with frequent baths and lotion. The foster mother also testified that "[s]he cried a lot if you interacted and was happier or silent if you left her alone." The foster parents have an adopted son who is about a year and a half older than K.Y.S. The children are very close with one another and view each other as siblings.

Mother has never requested K.Y.S. for the child's birthday, Mother's Day, or any major holiday other than Halloween. The foster mother testified that they always try to work with mother's schedule for visits, but that their efforts are not reciprocated. The foster mother also noted that the child would return "defiant" from visits with mother because splitting time between the foster family and mother confused her. The foster mother wishes that mother would take the child's nap and bedtime into consideration, since mother does not work and can visit anytime. She testified that mother often returns the child cranky and dirty or wet despite requests from them that mother feed and bathe her if visits run into the evening. The foster mother testified that mother has stormed out of court hearings and child and family team meetings, the last being in August 2016. The foster parents are both employed full-time, financially stable, capable of meeting all of the child's needs, and, in the words of the trial court, "love [the child] very much and are anxious to adopt her." A CASA volunteer testified that she had observed the child with both families and believes it is in the child's best interest to be adopted by the foster parents.

Grandfather had also petitioned for custody of the child. The juvenile court denied his petition, which grandfather appealed. However, the day of the termination trial, grandfather dropped the appeal. Mother did not learn that grandfather planned to drop his appeal until a week before trial. Prior to that time, mother hoped grandfather would obtain custody of the child because she thought the child would have a "better chance" living with grandfather. Grandfather testified that he loves K.Y.H. very much and wishes he could take care of her. However, grandfather was in poor health at the time of trial and felt that he may have as little as a year left to live. He testified that the child is thriving with the foster parents and that he would like for them to adopt her, at which time he "will be at their mercy" for any further contact. He testified that mother has been doing better for approximately a year. He disputed mother's psychiatric visits and suicide attempts, asserting that the number is nowhere near fifty. He stated that mother could possibly move back into his house if she regained custody of the child now that his wife has passed.

The worker who has supervised more than fifty visits between mother and the child also testified. She stated that most visits last about four hours. She testified that mother and the child had little bond at the beginning, but have grown closer, and that she has no concerns about mother's supervision or relationship with the child now. The worker stated that mother and the child now have a strong, loving bond and that mother cares for the child well during visits and acts appropriately, despite allegations to the contrary, including mother sending the child back to daycare wearing a maxi-pad and a pair of G.H.'s underwear pinned with safety pins because she did not have any diapers. When asked how is mother's "affect and demeanor in the last – since the beginning, especially in the last year," the worker responded:

7

Changed. She's not as emotional as she used to be. She's very focused on [the child]. If there's something that's gone on, you wouldn't know it now. There may be, but she's able to contain it, and she spends her time with her daughter.

At the time of trial, mother resided in an apartment with two roommates. She admitted that there is not enough room to accommodate K.Y.H. She has not allowed DCS or CASA in the home because she does not plan to bring the child there if granted custody. She also testified that the apartment is in a "rough neighborhood" where people used drugs "on the sidewalk in front of [her] door." Mother would like to reside with grandfather in his home if she gains custody of the child. G.H. resided with grandmother and grandfather for the majority of his childhood. Mother also resided with grandmother and grandfather other than a few short periods when she has lived with roommates.

Mother did not have a job at the time of trial. She received $630 to $650 a month in disability payments after deducting child support. She paid approximately $400 per month in rent and utilities. Mother testified that she sold artwork online, which provided her enough "to have spending money for [her] kids," but not enough to claim for tax purposes. She still occasionally depended on grandfather for food or gas money and used either her father's car or her bus pass for transportation.

Several witnesses were concerned about the child returning to mother's care. The CASA volunteer assigned to the case testified that she believes mother loves the child, but was not confident that mother could properly parent the child on a day-to-day basis or handle "the kind of problems that [the child] will encounter as she matures and grows up." She believed the child would be better off with the foster parents, as they would provide "an element of security and steadiness and normalcy" that mother could not provide. The nurse from Nurses for Newborns testified that mother did not follow her goals and directives and that, given mother's mental capacity, the nurse was not sure that it was safe for the child to be in her home. Grandfather also expressed his concern, testifying that "[a]t this point [mother is] not stable." Grandfather testified further that mother needed to find a job because her "biggest problem right now is her financial state." He said that he believed mother would need at least six more months to reach a point where she is ready to care for the child. Grandfather also testified that he was "very comfortable" with the child's foster home placement and "ha[d] no problem with them adopting her."

The trial court found that the conditions that led to removal, as implicated by the language of Tenn. Code Ann. § 36-1-113(g)(3), still persisted. The court also found that termination of mother's rights is in the child's best interest. The court stated that it made these findings based on clear and convincing evidence. Mother appeals.

## II.

Mother raises one issue on appeal: Whether the trial court erred in terminating her parental rights based on persistence of conditions under Tenn. Code Ann. § 36-1-113(g)(3). While not raised as an issue, the best interest of the child will be considered by us pursuant to the edict of the Supreme Court.

## III.

A parent has a fundamental right, based upon the federal and state constitutions, to the care, custody, and control of his or her children. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174–75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court is tasked with conducting a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

9

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525–26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest [ ], regardless of whether the parent challenges these findings on appeal.")

The Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523–24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

As pertinent to this appeal, Tenn. Code Ann. § 36-1-113(g)(3) allows a court to terminate parental rights when

10

[t]he child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents . . . , still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

With respect to subsection (g)(3) of § 36-1-113, the trial court found clear and convincing evidence to support this ground of termination. The court observed as follows:

[T]he child has been removed from Mother's home by order of a court for a period of six (6) months, and (1) the conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's return to the care of the parent still persist; (2) there is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent in the near future; and (3) the continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

Mother argues on appeal that the conditions that led to the child's removal do not persist, since the child is no longer medically fragile and mother no longer possesses irrational thought processes. Mother asserts that the trial court specifically found that she "currently is compliant with and stable on her prescribed psychotropic medication." She notes that, although her "significant" mental health issues will endure, she has achieved considerable stability due to her mother's passing. Mother asserts that the psychologist and the nurse from Nurses for Newborns have not observed her behavior in almost two

11

years before trial. Mother also argues that the psychologist did not observe how mother bonded with and cared for the child during their recent visits. As a result, mother argues that the testimony of the worker who has supervised more than fifty visits between mother and the child in the past three years should be given more weight.

Additionally, mother argues that the record does not contain clear and convincing evidence that the child could not be returned safely to her at an early date. Mother asserts that grandfather has agreed that she and the child can move in with him, which would provide the child with suitable housing and provide mother with an additional $400 a month in money she is currently spending on rent.

There is clear and convincing evidence in the record contradicting mother's arguments. "A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App., filed Oct. 13, 2008). Here, the child has been in the care of her foster parents for well over three years. The conditions that led to the child's removal *or other conditions* that in all reasonable probability would cause the child to be subjected to further abuse or neglect and prevent the child's safe return still also persist. The foster mother testified that mother would often return the child from visits hungry and with a dirty diaper. The Nurses for Newborns nurse and the foster mother both indicated that mother fails to make the child a priority, does not work with the foster parents' schedules for visits, and does not ask for the child on any of her birthdays or holidays other than Halloween. The foster mother testified that mother's behavior is still unpredictable and that she would go "from zero to sixty in no time," say hateful things, and storm out. Mother demonstrated similar behavior at court hearings, yelling at the nurse from Nurses for Newborns during testimony, pulling a pair of pliers out of her purse prompting intervention from court officers, and storming out of the courtroom. Her autistic son was present at the hearing and became so upset that he left the courtroom and cut all of his hair off by the end of the proceedings. Mother also admitted to being hospitalized on many occasions in psychiatric facilities, the most recent being only three weeks prior to trial after seeing a physical altercation between her friends. Mother even acknowledged that she wished for grandfather to gain custody of the child, as the child would stand a "better chance" with him. Mother also lacks suitable housing, save for grandfather's home. At trial, mother acknowledged that she lives in a "rough neighborhood" where people use drugs on the sidewalk in front of her door. She also stated that she still occasionally depends on grandfather for food, gas money, and transportation.

The record as described above also demonstrates that there is little likelihood that mother will be able to remedy her mental and financial instability at an early date. The

child has resided in the same foster home since the trial home visit ended more than three years ago. The foster parents have expressed interest in adopting the child. Allowing the parent/child relationship to continue threatens the child's chances of early integration into a safe, stable, and permanent home.

Mother cites two cases to support her arguments. In **In re K.C.**, No. M2005-00633-COA-R3-PT, 2005 WL 2453877 (Tenn. Ct. App., filed Oct. 4, 2005), this Court reversed a trial court's finding of persistence of conditions because the mother had married, became employed, found a suitable place to live, had enjoyed stability for some time, had raised her other son with no evidence that she was an inadequate parent for that child, and no longer possessed an emotional inability to parent the child. This Court also held that reliance on government benefits does not necessarily create a reasonable probability that a child will be neglected. In the case at hand, mother is not reliably employed, does not have a suitable place to live, and has not indicated a mental, emotional, or financial stability for an extended period of time. Mother also had a good deal of difficulty parenting her older son, who had to rely on his grandparents for care and had to be isolated from mother during his hospital stay because of the mental and emotional difficulties that arose from her visits.

Mother also cites **State Dep't of Children's Servs. v. C.L.**, No. M2001-02729-COA-R3-JV, 2003 WL 22037399 (Tenn. Ct. App., filed Aug. 29, 2003), where this Court reversed a trial court's finding of persistence of conditions where father demonstrated that, with help and training, father could parent his nine children. In **C.L.**, DCS had only two concerns: (1) father's ability to parent his nine children because of their number and his work schedule and (2) his continuing loyalty to mother, who had left the children unsupervised and failed to meet the nutritional needs of at least one of them. The only condition that had prevented father from gaining custody immediately after mother was arrested was his lack of housing and furnishings to accommodate all of the children at the time. In the case at hand, mother demonstrates a lack of mental, emotional, and financial stability that the father in **C.L.** did not demonstrate.

As a result, we hold that the evidence does not preponderate against the trial court's judgment with respect to persistence of conditions. Furthermore, we hold, as a matter of law, that there is clear and convincing evidence supporting the trial court's judgment on this point.

## V.

Based on our finding that statutory grounds warrant terminating mother's parental rights, we now focus on whether termination of her rights is in the best interest of the child. Mother did not challenge the trial court's findings regarding the child's best

13

interest in her brief. However, as previously stated in this opinion, we must still review those findings on appeal. *See **In re Carrington***, 483 S.W.3d at 525–26. When considering the issue of "best interest," we are guided by the following statutory factors set forth in Tenn. Code Ann. § 36-1-113(i), which provides that

> [i]n determining whether termination of parental . . . rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . ;
>
> (2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent . . . has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest[ ] must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

The trial court found that

> [p]ursuant to T.C.A. § 36-1-113(i)(1), Mother has not made an adjustment of circumstances, conduct or conditions so as to make it safe and in [the child's] best interest to be in Mother's home. After more than three (3) years in foster care, Mother is not prepared on the day of trial to assume custody of [the child]. She readily admitted that the place where she resides in not safe or appropriate for a small child.
>
> Pursuant to T.C.A. § 36-1-113(i)(2), Mother has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible. In more than three (3) years, Mother has not yet been able to progress to having unsupervised visitation with [the child].
>
> Pursuant [to] T.C.A. § 36-1-113(i)(8), it appears to the Court that Mother's mental and/or emotional status would be detrimental to the child and/or prevent her from providing safe and stable care and supervision for the child. Although two years old, [the psychologist's] report and the various episodes where Mother has been unable to maintain her calm

15

during DCS meetings, court hearings or in therapy sessions with [her older son] support this finding.

A change of caretaker and physical environment is likely to have a negative effect on [the child's] emotional, psychological and/or medical condition pursuant to T.C.A. § 36-1-113(i)(5). It is abundantly clear that [the child] is very bonded with her foster family, including her foster brother . . . . This is to be expected after residing with them for the majority of her young life. She has been with the [foster family] for nearly three years now and will turn four on October 24, 2017.

Contemplating whether [the child] has a meaningful relationship with Mother is troubling to the Court. The testimony is that [the child] knows who she is and they have developed a bond that has grown closer over the time she's been in DCS custody. It is also clear that her bond with the foster family is a closer one. There is no doubt in the Court's mind that Mother loves [the child] and that . . . grandfather and [mother's older son] adore her, as well. However, the Court must make its decision based on the best interest of the child, not the best interest of the adults. The Court finds that this factor weighs in favor of termination of parental rights.

(Paragraph numbering in original omitted.)

We find that the factors in Tenn. Code Ann. § 36-1-113(i) indicate that it is in the child's best interest that mother's rights be terminated. Mother has not made an adjustment of circumstance, conduct, or conditions to make it safe and in the child's best interest to be in her home, as she has still exhibited outbursts and mental instability and has failed to locate appropriate housing other than potentially with grandfather, even though the child has been removed from her custody for three years. Mother has maintained regular visitation with the child, but frequently brings her back hungry and with a dirty diaper. The record seems to also demonstrate that mother has a meaningful relationship with the child based on testimony regarding their bond and love for one another. However, the child has been in the care of her foster family for over three years, and a change to mother's custody would likely have a detrimental effect on the child's emotional, psychological, and medical condition. Mother admits that the physical environment of her current home is unsafe, as she has observed people using drugs on the sidewalk in front of her door. The most significant factor, however, is mother's mental

16

and emotional status. Although mother seems more stable than she was prior to grandmother's passing, mother still exhibits signs of intense anger and mental instability that would potentially prevent her from effectively providing safe and stable care and supervision for the child.

This Court recognizes that mother cares for the child and is not at fault for her struggles with mental illness. The issue, however, is what is in the best interest of the child. We hold that the evidence does not preponderate against the trial court's finding that termination is in the best interest of the child. Furthermore, we hold, as a matter of law, that there is clear and convincing evidence to support the trial court's best interest determination.

**VI.**

The judgment of the trial court is affirmed. Costs of appeal are assessed to the appellant, C.K.H. The case is remanded to the trial court for enforcement of that court's judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE